# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48817

STATE OF IDAHO,      )
     )
     Plaintiff-Appellant,      )      **Boise, June 2022 Term**
     )
v.      )      **Opinion filed: August 31, 2022**
     )
DANIEL LEE MOORE,      )      **Melanie Gagnepain, Clerk**
     )
     Defendant-Respondent.      )
     )

Appeal from the District Court of the First Judicial District of the State of Idaho, Boundary County. Barbara A. Buchanan, District Judge.

The decisions of the district court are reversed in part and affirmed in part.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Kenneth Jorgensen argued.

Bolton Law, PLLC, Coeur d'Alene, for Respondent. Katherine Jill Bolton argued.

_____

MOELLER, Justice.

On August 27, 2020, police interviewed Dr. Daniel Lee Moore ("Moore") concerning the murder of Dr. Brian Drake ("Drake"), who had been shot in his chiropractic office over five months earlier. Although Moore invoked his right to an attorney at least three times, the interrogation continued. Moore eventually confessed to the crime and was charged with second-degree murder. Following a defense motion, the district court suppressed the confession after finding that Moore's *Miranda*[1] rights had been violated. The district court later dismissed the case, concluding that because the State had relied on the tainted confession in the preliminary hearing, there was insufficient evidence to support a showing of probable cause. The State appeals from the district court's decision dismissing its case against Moore.

On appeal, the State concedes that there was a *Miranda* violation but argues that the district court erred in dismissing the case. Although the *Miranda* violation rendered Moore's statements

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

inadmissible in the State's case-in-chief, the State maintains that the statements could still be used to impeach a claim of innocence by Moore if he were to testify at trial. Addressing the decisions of the district court, the State also argues that (1) there was no due process violation because "the district court failed to find a constitutionally prohibited coercion" and "the district court erred as a matter of law when it concluded that Moore's will was overborne;" and (2) "the district court erroneously reviewed the admissibility of the evidence at the preliminary hearing rather than determining if the evidence *in fact admitted* supported the magistrate's probable cause findings." (Emphasis in original).

## I. FACTS AND BACKGROUND

### A. Murder and a Gas Leak

On March 12, 2020, after finishing up with his last patients of the day, Drake was shot in the back and killed while talking to his wife on his cell phone. The shot came through the window of his chiropractic office in Bonners Ferry, Idaho. The blinds to his office window were closed and the autopsy indicates that he was likely sitting. Drake's office is on the same street as the office of another chiropractor, Moore.[2]

When he was first interviewed, Moore, then 63 years old, told police he was at his friend Mick Mellett's ("Mellett")[3] house on the night of the murder. He claimed to have left Mellett's house, being ill with diarrhea, to go to his office in search of medicine. When he could not find any, he went back to Mellett's house for Imodium. Moore stated he was with Mellett when the call came in about the shooting. Later, when questioned about his involvement in Drake's death, officers told Moore that investigators had security footage of his truck in the vicinity of the shooting at the time it occurred. He then explained that he was in the area because he had gone into the alley behind his own office to defecate.

Three days after the murder, there was a gas leak in Moore's office. Mellett had passed by the office on his way to breakfast with a friend and noticed Moore's truck in the parking lot. When he returned home, he noticed the truck was still at the office, and, since it was unusual for him to be there on a Sunday, he used his key to enter Moore's office. He found Moore getting up from an exam table, appearing "woozy." Mellett took Moore outside the building and called to report the

---

[2] The two offices are approximately 500 feet from one another.
[3] Mellett is the Boundary County Coroner. He is listed as the responsible party on the autopsy report completed by medical examiner and forensic pathologist Dr. Sally Aiken.

2

gas leak. Moore explained that he had gone to his office to change a furnace filter when he was overcome with the gas leak and became unconscious. Moore claimed he has anosmia (the loss of the sense of smell) and did not notice the scent of gas.

Police interviewed Fire Chief David Winey who responded to the gas leak. He stated that he discovered a "gas fitting" was just finger tight, noting that this was odd and that he had never seen that before in his experience. Police also interviewed an experienced local rep for Avista, a regional natural gas company, with 30 years of experience. He opined that the gas fitting was intentionally loosened.

### B. The Investigation Focuses on Moore.

At the time of the shooting, Moore owned a white Toyota Tundra pickup. Law enforcement reviewed security footage from multiple local businesses recorded at the time of Drake's murder. Although the video recordings displayed inconsistent timestamps (some off by several hours), when properly pieced together, police determined that the footage validates a conclusion that Moore's truck was near the scene of the murder at the time it occurred. Idaho State Police ("ISP") Detective Sergeant Michael Van Leuven ("Van Leuven") summarized the security footage as follows:

> We later observe [Moore's] truck leaving Mellett's house just prior to the shooting. The truck is then seen circling the area where the shooting occurs two times, including driving down the area between the two buildings directly outside the window where the shooting occurs and then stopping for several seconds. Dr. Moore's truck then drive's [sic] north on Main Street from Dr. Drake's office and parks at Dr. Moore's office. After parking, the taillights flash in a manner consistent with Dr. Moore locking his truck with a keyless remote. A human figure is then seen walking from the direction of Dr. Moore's office toward Dr. Drake's office one and half minutes before the shooting occurs. As previously established, the shooting occurs at 7:26 p.m. A human figure is then seen walking and then running back from the area of Dr. Drake's office toward Dr. Moore's office one and [a] half minutes after the shooting. The lights on the back of Dr. Moore's truck, again, flash in a manner consistent with Dr. Moore unlocking his truck using his keyless entry. His truck is then seen driving back toward Mellett's house (300 feet away). . . . After five minutes Dr. Moore's truck is then seen leaving Mellett's house and driving a circuitous route back toward Dr. Moore's house that conspicuously avoids the crime scene.[4]

---

[4] This information comes from the search warrant affidavit. The information in that affidavit was provided by ISP Detective Sergeant Michael Van Leuven.

Moore was first contacted by ISP Detectives Richard Alderson ("Alderson") and Leslie Lehman ("Lehman") regarding Drake's murder on March 24, 2020. On May 6, Sergeant Van Leuven and Detective Alderson re-interviewed Moore at his office. No charges resulted from these initial interviews.

### C. Moore's Custodial Interrogation

After months of investigation, law enforcement sought to interview Moore again without arousing his suspicion that he had become the primary suspect. On August 27, 2020, Lehman asked Moore to bring his wife's gun to the Boundary County Sheriff's Office. Lehman later testified at the suppression hearing that law enforcement knew that the gun was not the one used in the shooting, but they had requested that he bring the gun simply to get Moore to the Boundary County Sheriff's Office. While Moore waited for the firearms specialist to inspect and photograph the gun, the firearms specialist and the detective who asked him to bring the gun engaged in small talk with Moore. Van Leuven entered the room and asked Moore if he would answer a few more questions. Several other officers entered the room and told Moore they were taking him back to a "secure area" and that he would need to be checked for weapons before entering the "secure part of the facility." Lehman told the officers she would hold onto Moore's car keys. Moore did not have his cell phone on his person because he had left it in his car.

Van Leuven and ISP Detective Gary Tolleson ("Tolleson"), neither of whom were dressed in uniform, took Moore into an interrogation room, which required a key code for entry, and closed the door. Moore entered the room holding a bottle of water. The interrogation began at 2:49 p.m. Almost immediately, the investigators accused Moore of killing Drake, which he denied. Approximately four and a half minutes into the interrogation, Van Leuven stated: "I need to advise you of your *Miranda* rights too, just 'cause we are in a police station.' " Van Leuven and Tolleson then outlined the evidence the police had gathered placing Moore's truck at the scene of the murder. Van Leuven explained the difference between a premeditated killing, which would result in a first-degree murder charge, and blindly shooting through a window, which would result in a lesser charge, and told Moore, "this is your opportunity to pick which one it is." Moore stated he did not know Drake and did not shoot him.

Van Leuven said, "if you don't explain to us your intent, then we infer your intent based on what we see, which is [f]irst [d]egree [m]urder." Moore responded, "Well, I didn't shoot him. And I'm sorry, but that's – that's what it is. So, I guess if you are going to do that, then I need to

4

get an attorney." Van Leuven said, "[O]K," and Tolleson and Van Leuven immediately began packing up their things to leave. Moore then asked what the point was in having him bring the gun down, to which Van Leuven said they needed an excuse to have him come to the police station. Van Leuven told Moore they were in the middle of interviewing Mick again and that Mick's house and business were being searched. Van Leuven then asked, "do you have a cell phone on ya?" Moore responded, "no" and told him it is in his car. Van Leuven said "[O]K. Sit tight. And we'll be right back with ya. Okay, I'm gonna terminate this interview at 3:05."[5] Van Leuven and Tolleson then left the room. "Van Leuven testified at the suppression hearing that he terminated the interrogation 'because it sounded to me like he asked for a lawyer,' and he spent the next 45 minutes replaying the interview and consulting with officers about how to proceed." One of the officers Van Leuven consulted was Assistant Chief Ryan.

Van Leuven eventually decided to continue the interrogation and allowed Ryan, "who knows Moore from their many years in the Bonner's Ferry community," to question Moore. After Moore was left sitting in the interrogation room alone for approximately 41 minutes, Ryan entered the room and began interrogating Moore.

Approximately fourteen and a half minutes into his interrogation with Ryan (one hour and fourteen minutes into the entire interrogation), Moore said, "I need to talk to an attorney then." Ryan responded, "Okay. I understand. Then-then we're done. I-I-I know a minute ago you said 'I think,' but know [sic] you're tellin' me you wanna talk to [an] attorney, you don't wanna talk to me anymore." Moore replied, "Well it just, no—." Ryan said "No. no. no. I want you to say that. Because it's important, Daniel. You can't 'I think this, I think that'. Brother, I-I don't wanna do anything to violate anything here. You know why I'm here."

Importantly, as the district court noted, at this point Moore had never actually said "I think"; rather, he had unequivocally stated, "I need to talk to an attorney then." Nevertheless, Ryan continued to seek clarification on whether Moore would rather speak to him or an attorney:

> ASST. POLICE CHIEF RYAN: [O]K? I'm tryin' to do the best (unintelligible) [to] fix this thing I can.
> DANIEL MOORE: Yeah.
> ASST. CHIEF RYAN: [O]K, so I've painted the best picture I can for you and I've asked for your help on this. But you have to be clear. I can only talk to you if you want to talk to me. You understand, Daniel?

---

[5] Because this excerpt from the transcript, and those that follow, contain so much colloquial terminology, they will be quoted verbatim except where bracketed language is necessary to provide context or clarify meaning.

MOORE: Yeah.

ASST. CHIEF RYAN: Okay. But if I walk out, that's it. You're not seein' me anymore, alright? So you-I-I'm gonna leave then. Is that what you're sayin'?

MOORE: I-I'm just sayin' that there's a reason I went to [Mellett's] to get the Imodium because I had diarrhea.

ASST. CHIEF RYAN: Okay.

MOORE: And-and-and so I don't know why that's such a hard thing for people to understand. It's not a made-up story; I had diarrhea.

ASST. CHIEF RYAN: Okay. Dan? You and I both know why. Because of what you're thinkin' of, what you're doin' and-and how it makes you sick to your stomach because you have a good heart. [O]K? You did somethin' stupid. But again, I-I can't heal. I can't make these phone calls. I can't talk to the paper with anything unless you say you wanna talk to me. Alright? We-we—you wanna talk to me or not? Yes or no?

MOORE: I think I need to talk to an attorney.

ASST. CHIEF RYAN: K. Well you're doin' that again, you say "I think". Alright, brother. Okay. I'm gonna go. Okay?

MOORE: But I really do appreciate you and—

ASST. CHIEF RYAN: It's done.

MOORE: Yeah

ASST. CHIEF RYAN: It's over. Okay?

Ryan then stood up to leave. Before he could exit the room, Moore re-engaged Ryan, asking him: "So what do I do?" The following conversation occurred while Ryan was standing by the door:

ASST. POLICE CHIEF RYAN: Well, I—they're gonna (unintelligible) I-I'm-I'm pullin' myself out. [O]K? I got healing to do. I have-I have work I gotta go do know, [o]k?

DANIEL MOORE: Thank you.

ASST. CHIEF RYAN: You're welcome. At this point—

MOORE: Yes, sir.

ASST. CHIEF RYAN: (unintelligible) One more. I want the truth.

MOORE: (unintelligible) too.

ASST. CHIEF RYAN: I want the truth.

MOORE: You want me to admit that—

ASST. CHIEF RYAN: I want you to admit the truth, but. Geez, Dan. You're killin' me, Dan. [O]K, buddy?

MOORE: Without an attorney, you want me to talk. And say somethin'—

ASST. CHIEF RYAN: Well again, no. I don't want you to do anything you don't wanna do. All I wanna do is go say—I wanna go tell my community the truth. That's what I wanna do. Okay? And (unintelligible) I feel dirty and I feel like, you know, this is getting'—I'm not tryin' to pull stuff from you—anything but the truth. I know you're a good man and I-an I-I-I asked these guys, "Please let me talk to him." Okay? Because you're-you're a good man. And I know that if you can fix this, you wanna fix it. There's only one answer and that's the truth. There's only one right thing in this world, that's the truth.

MOORE: That's right.

ASST. CHIEF RYAN: That's all that matters, okay?

DANIEL MOORE: That's right.

ASST. CHIEF RYAN: Okay. Our community deserves it. That family deserves it. And your lineage. Your memory of yourself—what you pass on matters. Okay? And so what happens when I walk out this door is then you're gonna be goin' to jail, alright, brother? And-and that's just the way it's gonna go.

MOORE: Even if I say what you want me to say—

ASST. CHIEF RYAN: I want you-I want you to say the truth.

MOORE: And even if I—

ASST. CHIEF RYAN: Explain it.

MOORE: Even if I say the truth—

ASST. CHIEF RYAN: Yeah

MOORE: --I'm still goin' to jail

ASST. CHIEF RYAN: Yeah, but you're goin to jail with a whole lot more explanation. Okay? You know that. A whole lot more explanation. So that's where I'm at. Okay, brother? And I can get an attorney here and you can explain it to him if you want, or however you wanna do it. But-but you-you have to want to tell us. Because I-I wanna know. You gotta be booked for somethin'. You gotta be held accountable, right?

MOORE: Right

ASST. CHIEF RYAN: I[f] you make a mistake, you have to be held accountable. Do you ever spank your kids?

MOORE: Absolutely.

ASST. CHIEF RYAN: Okay. That's how we teach accountability. Well we're big boys now. Right? So you have to be held accountable. The community owes that. But this is you steppin' forward sayin', "I f'ed up." "Here's what I did wrong." Hear what I'm sayin'?

MOORE: Mm hmm.

ASST. CHIEF RYAN: Okay. Alright. So where-where it's really treacherous waters here (unintelligible) talkin' you and me, but brother, I-I-I-I don't know what else to do. I don't know what else to do. I-I tried my best to help you see the light. [O]K?

MOORE: No, I-I see what you're sayin'.

ASST. CHIEF RYAN: [O]K.

MOORE: I just—

ASST. POLICE CHIEF RYAN: Do you wanna say it? If you wanna say it, just say it. Get it off your chest and be done with it. Whatever happens, happens. But just get it off your chest if that's what you wanna do.

Ryan then made an assurance to Moore, "But I promise you this: if you do, I promise you, I'll go talk to him about what booking we're lookin' at. I promise you that. And-and it won't be first degree murder, I can guaran-damn-tee." Moore said, "I see what you mean." Moore asked if he could use the bathroom, and Ryan said, "Yeah. Hold on one second, okay?" Ryan exited the room

and Moore was left alone in the interrogation room for about one minute and 45 seconds before an unidentified officer opened the door and escorted Moore to the restroom.

After the unidentified officer and Moore returned to the interrogation room, the officer asked Moore if he would like a blanket. Moore asked for the blanket and another water bottle. Moore was left alone for approximately 30 seconds before Ryan entered the room. Ryan told Moore that someone would grab his water and blanket.

One hour and twenty-six minutes after the start of the initial interrogation, Moore invoked his right to counsel again: "I wanna be able to talk to somebody u-using my legal rights." Ryan then responded:

> ASST. POLICE CHIEF RYAN: Okay, there it is.
> DANIEL MOORE: So that's—
> ASST. CHIEF RYAN: Yeah. I understand, buddy.
> MOORE: --that doesn't mean I don't wanna talk to you.
> ASST. CHIEF RYAN: I know, buddy. I understand, okay? Okay.
> MOORE: And that's-that's the only thing that I'm saying. Because it's like, just because I circled the block doesn't mean I [sic] casing some guy trying to kill him.
> ASST. CHIEF RYAN: Daniel. Wow, okay buddy. Just. [O]K? We're done. Y-y-y-y-ou—we're done. I can't fuckin' talk to you anymore Daniel. Okay, buddy?

Ryan then left the room and Tolleson entered with Moore's requested water and blanket. Moore asked Tolleson what would happen with his car and belongings. Tolleson informed him they would tow his vehicle and that search warrants were currently being served for his house, vehicle, and office.

One hour and twenty-eight minutes into the interview, Moore then asked Tolleson, "can I talk to Ryan one more time?" Ryan reentered the room and began speaking with Moore once again:

> ASST. POLICE CHIEF RYAN: [O]K. [The] Detective asked me to come in here. Please tell me I'm back here for the right reason.
> DANIEL MOORE: What-what should I do if I-if I don't have an attorney and I-and I tell you something and I'm—
> ASST. CHIEF RYAN: Right.
> MOORE: I mean and it—that just seems—
> ASST. CHIEF RYAN: Right
> MOORE: —already like, I still would like to talk to you, but it's like—

Ryan said, "I'm sitting here with my favorite doctor, Moore, across the table from me; one of the nicest men I've ever known and – and, I-I-know-I know what you did." Ryan repeatedly told Moore he was asking for the truth and wanted the "why." Ryan reminded Moore of his history with and love for the town. Moore maintained he did not even know Drake. Ryan continued

8

questioning Moore, asking him to explain why he walked into the alley and encouraging him to "talk to me what happened. Just-just explain it. Just get it out. Be done with it, please." Moore insisted he went into the alley because he "really did have to take a crap." Ryan continued to press Moore:

> ASST. POLICE CHIEF RYAN: I'm not gonna do this anymore. You keep askin' them to talk to me and ask me to come back in here. Y-y-you—I'm only gonna talk to you, Dan i-if you and I have the relationship of honesty. I've been honest with you.
> DANIEL MOORE: Yes, sir.
> ASST. CHIEF RYAN: [O]K? I'm only gonna talk—You asked me to come back in here. Why did you ask me to come back in here? . . . What did ya-what did ya call me back in here for? Daniel? Dr. Moore?
> . . .
> MOORE: I guess just cuz I wanted to talk to ya.

Ryan explained that the police knew it was Moore who killed Drake and that without Moore's confession as to why he did it, they would charge him with first-degree murder.

After Ryan again told Moore that "[y]ou called me in her for nothin'," Moore said, "And if I have an attorney—just-just here [sic] me out, Marty. How am I gonna plead to anything if-if I'm sitting there spilling my guts to you and I don't have an attorney that gives me my rights." Ryan responded:

> [O]K. That's—again, see Y-y-you understand, Daniel. You-you-you keep saying this. I can't answer that question. How do you do that? I don't know, [o]k? I-I-I know what we have right now. And the only person who can change what we have right now is you. Alright? And so you have to decide how—if you wanna change what we have, then-then change it. But-but if you mention and [sic] attorney – and you keep on doing it – if you mention it, I'm just—because and-and it's your right. You have a right to an attorney. But when I leave then you call me back in here, say "I wanna talk to you again" well then we restart everything again. I come back up here, what do you want Dan? Cuz you know, you know I just wanna heal my town. I wanna call the wife and tell her this was-this was just a bad mistake. I wanna do something, okay? And so I'm hurtin' here too, buddy.

Approximately one hour and 43 minutes from the start of the interrogation, Moore made his first incriminating statement to Ryan: "I did not go there to murder him." As the interrogation continued, Moore ultimately confessed to killing Drake. The total interrogation time, from the time Van Leuven started the interview at 2:49 p.m., lasted approximately three hours. Moore was then booked and placed in the Boundary County Jail on the charge of second-degree murder.

### D. Procedural History

9

Moore appeared before the magistrate court on October 2, 2020, for his preliminary hearing. Prior to the preliminary hearing, Moore moved to exclude all the statements he made during the August 27, 2020, interrogation after he first invoked his right to counsel. The magistrate court decided to hear all the evidence before ruling on the motion. The State informed the magistrate court that if it suppressed Moore's statements from his interrogation, it would move to proceed with admitting additional evidence showing the route Moore's truck traveled through the crime scene. The State further explained that if the magistrate court did not suppress Moore's statements, then it would not need to bring in that additional evidence.

The State called Van Leuven to testify before moving to the issue regarding the admissibility of the confession. After hearing the evidence from the interrogation, the magistrate court ruled that there were no grounds to grant the motion to suppress the confession because Moore had reinitiated the custodial interrogation with Ryan when he asked to talk to him one hour and twenty-eight minutes into the interview. The magistrate court asked the State if it had any other evidence. The State rested. The defense then called Ryan and Van Leuven to testify. At the end of the hearing, the magistrate court asked the State if it wished to call any rebuttal witnesses. The State declined. The magistrate court found that the State had met its burden of proof and established probable cause. The magistrate court then bound Moore over to the district court. Moore's arraignment before the district court was held November 5, 2020. Moore entered a not guilty plea.

Once in district court, Moore again moved to suppress all statements made by him during the August 27, 2020, custodial interrogation prior to the reading of his *Miranda* rights and all statements made after he invoked his right to counsel. The State objected, arguing that Moore had reinitiated contact with law enforcement when he asked to speak to Ryan again. The suppression hearing was held January 14, 2021. The defense called Van Leuven, Lehman, and Moore to testify.

On February 12, 2021, the district court entered its memorandum decision and order granting defendant's motion to suppress. The district court concluded that Moore was subjected to a custodial interrogation from the start of his interview with Van Leuven and Tolleson (when he was taken into the "secure area" of the Boundary County Sheriff's Office). The district court concluded that since the officers did not read Moore his *Miranda* rights before questioning him, all statements made by Moore from the start of the interrogation until his *Miranda* rights were read must be suppressed. The district court further determined that Moore unequivocally invoked his

right to counsel approximately 15 minutes into the interrogation when he stated, "Well, I didn't shoot him. And I'm sorry, but that's – that's what it is. So, I guess if you are going to do that, <u>then I need to get an attorney</u>." (Emphasis in original). The district court concluded that the police failed to cease questioning when Moore unequivocally invoked his right to counsel:

> . . . Van Leuven asked Moore if he had a cell phone on his person. Moore said his phone was in his car. Van Leuven told him to "sit tight"; he terminated the interview, and the two detectives left the room. Moore was left seated alone in the interview room for 45 minutes. Then, Van Leuven, instead of cutting of [sic] questioning, sends in Assistant Police Chief Ryan – who knows Moore from their many years in the Bonners Ferry community – to continue the interrogation of Moore. Moore had not asked to talk to Ryan. Ryan entered the room and continued the interrogation of Moore without ever mentioning Moore's request for an attorney.

The district court held that all statements after Moore invoked his right to counsel (15 minutes and 19 seconds into the interrogation) must also be suppressed. After reviewing the repeated ignoring of Moore's invocation of his right to counsel by Ryan, the district court concluded that "Moore's will was overborne by the badgering and overreaching of police such that his eventual waiver of his *Miranda* right to counsel was not made knowingly, voluntarily, and intelligently." The district court "further f[ound] that Moore's subsequent confession was not voluntary, but rather, was the product of police coercion." Accordingly, the district court granted Moore's motion to suppress the confession.

The State filed a motion for reconsideration of the memorandum decision and order granting defendant's motion to suppress. During the hearing on the motion for reconsideration (held March 31, 2021), the State argued that even if the suppressed statements and confessions could not be used in its case-in-chief, the statements were still admissible for impeachment purposes. The State also argued that the confession was not coerced. On April 14, 2021, the district court issued its memorandum decision and order denying the State's motion for reconsideration. The district court reaffirmed its finding that Moore's "confession was not voluntary, but rather, was the product of police coercion." The district court concluded that because Moore's confession was involuntary and the product of police coercion, *any* use of Moore's involuntary statement at trial would be a denial of due process of law. The district court held that Moore's confession was not admissible at trial, either in the State's case-in-chief or for impeachment purposes.

Moore then filed a motion to dismiss his case for lack of probable cause pursuant to Idaho Code section 19-815A, arguing that the videotaped confession was the only inculpatory evidence

11

presented by the State at the preliminary hearing, which the district court had now suppressed. A hearing on the motion to dismiss was held on May 5, 2021. On May 12, 2021, the district court issued its memorandum decision and order granting defendant's motion to dismiss and judgment of dismissal. Because the district court determined Moore's confession was involuntary, "Moore's incriminating statements were not admissible at his preliminary hearing." The district court concluded that because "the only evidence the State presented at the October 2, 2020, preliminary hearing connecting Moore to Brian Drake's death was the videotaped police interview," that "[t]here is no admissible evidence in the record to establish that Moore committed the crime for which he stands charged." The State timely appealed.

## II. STANDARDS OF REVIEW

We apply a bifurcated standard of review when considering a trial court's ruling on a motion to suppress. "When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *State v. Bodenbach*, 165 Idaho 577, 589, 448 P.3d 1005, 1017 (2019) (quoting *State v. Moore*, 164 Idaho 379, 381, 430 P.3d 1278, 1280 (2018)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)).

The standard in reviewing whether a defendant's custodial statements to police agents were voluntarily given is a mixed issue of law and fact. We defer to the lower court's findings of facts, as long as they are not clearly erroneous, but we freely review the application of constitutional standards to the facts found. *Davis v. State of N.C.*, 384 U.S. 737, 741–42 (1966); *State v. Kuzmichev*, 132 Idaho 536, 542, 976 P.2d 462, 468 (1999). Thus, we make an independent determination on the ultimate issue of voluntariness. *Davis*, 384 U.S. at 741–42.

Importantly, the evidence in this case consists entirely of the video and written transcripts of Moore's entire interrogation. Thus, "[t]his appeal presents the unusual situation where this Court has exactly the same evidence before it as was considered by the district court." *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018). "In such instance, we do not extend the usual deference to the district court's evaluation of the evidence." *Id.* Under such circumstances, this Court's "role on appeal is to freely review the evidence and weigh the evidence in the same manner as the trial court would do." *Id.* (internal quotations omitted). "[T]his Court exercises free review

12

over whether the constitutional elements have been met." *State v. Nunez*, 138 Idaho 636, 639, 67 P.3d 831, 834 (2003).

This case also concerns a preliminary hearing. "The decision of a magistrate that there exists probable cause to bind a defendant over to district court for trial on the charges should be overturned only on a showing that the committing magistrate abused his discretion." *State v. Owens*, 101 Idaho 632, 636, 619 P.2d 787, 791 (1979). When reviewing an alleged abuse of discretion, this Court reviews four elements: "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

### III. ANALYSIS

The parties agree that a *Miranda* violation occurred when the police continued to interrogate Moore after he requested an attorney the first time. However, the State argues that although a "[v]iolation of a prophylactic protection like *Miranda* results in exclusion of the evidence in the state's case-in-chief, it does not automatically result in suppression of derivative evidence or prevent the state from using the evidence as impeachment." For the confession to be inadmissible as impeachment evidence, the State asserts that there must have been an involuntary confession made as a result of police coercion. *Michigan v. Harvey*, 494 U.S. 344, 345–46 (1990); *New Jersey v Portash*, 440 U.S. 450, 459 (1979). The State contends that the district court erred when it concluded Moore's confession was coerced and when it concluded Moore's will was overborne. Additionally, the State argues that the "district court erroneously reviewed the admissibility of the evidence at the preliminary hearing rather than determining if the evidence *in fact admitted* supported the magistrate's probable cause findings." (Emphasis in original). We will address these issues in turn.

### A. The district court erred in ruling that Moore's confession was involuntary and inadmissible for impeachment purposes.

Although the State has conceded that Moore's *Miranda* rights were violated and acknowledged that "Moore's statements are inadmissible in the state's case-in-chief," the State seeks to use Moore's confession for impeachment purposes, if the need arises. The State argues that the district court erred when it concluded that Moore's confession was inadmissible for all purposes because (1) "[a] *Miranda* violation, standing alone, is not the coercion necessary to

13

constitute a due process or Sixth Amendment violation," and (2) "review of the factors cited by the district court show that the confession was constitutionally voluntary and not compelled self-incrimination."

Moore argues that the State's admission that a *Miranda* violation occurred also constitutes a concession of the ultimate issue on appeal: "[t]here cannot be both an involuntary waiver of the *Miranda* (Fifth Amendment) right to counsel and a voluntary, non-coerced confession." However, as the State correctly notes, the test for a *Miranda* violation is not the same as the test for coercion and a violation of due process. "Whether a defendant has waived *Miranda* rights and whether a confession was voluntary have overlapping—though different—analyses." *State v. Samuel*, 165 Idaho 746, 762, 452 P.3d 768, 784 (2019).

> *Miranda* warnings are premised on and designed to protect the Fifth Amendment privilege against self-incrimination, while the exclusion of involuntary confessions is grounded in the Due Process Clause of the Fourteenth Amendment, and it applies to any confession that was the product of police coercion, either physical or psychological, or that was otherwise obtained by methods offensive to due process.

*Id.* (quoting *State v. Doe*, 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct. App. 1997)) (internal quotations omitted).

While statements taken in violation of *Miranda* "may not be admitted as substantive evidence in the prosecution's case in chief," they may be used for impeachment purposes. *Harvey*, 494 U.S. at 345–46. There are sound reasons for this rule. An illegally obtained confession should not give a defendant license to perjure himself at trial. "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New York*, 401 U.S. 222, 226 (1971).

However, if coercion is found, the confession is not voluntary. In such instances, the confession cannot be admitted for any purpose at trial:

> The Fifth and the Fourteenth Amendments provide that no person "shall be *compelled* in any criminal case to be a witness against himself." . . . [A] defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial. "But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." (Emphasis in original). *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 2416, 57 L.Ed.2d 290 [(1978)].

*Portash*, 440 U.S. at 459. Important to this case, if a confession is the product of coercion and involuntary, it cannot be used, even for impeachment purposes:

14

> Whether otherwise excluded evidence can be admitted for purposes of impeachment depends upon the nature of the constitutional guarantee that is violated. Sometimes that explicitly mandates exclusion from trial, and sometimes it does not. The Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise.

*Kansas v. Ventris*, 556 U.S. 586, 590 (2009).

Here, for the State to use Moore's statements for impeachment purposes, his statements must have been both uncoerced and voluntary. The district court concluded that neither requirement was met. This Court defers to the trial court's findings of fact—so long as they are not clearly erroneous—and exercises free review when determining whether such facts are "constitutionally sufficient to show voluntariness." *State v. McLean*, 123 Idaho 108, 111, 884 P.2d 1358, 1361 (Ct. App. 1992). Neither party disputes the district court's findings of fact. However, the State argues that the facts do not support a conclusion that the confession was coerced and involuntary.

The State bears the burden to prove "by a preponderance of the evidence that the confession was voluntary." *State v. Culbertson*, 105 Idaho 128, 130, 666 P.2d 1139, 1141 (1983). "If the defendant's free will is undermined by threats or through direct or implied promises, then the statement is not voluntary and is inadmissible." *Samuel*, 165 Idaho at 766, 452 P.3d at 788 (quoting *State v. Fabeny*, 132 Idaho 917, 922–23, 980 P.2d 581, 586–87 (Ct. App. 1999)). In determining whether a confession is voluntary, "the Court must look to the 'totality of the circumstances' and determine whether the defendant's will was overborne." *State v. Radford*, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)). When considering the totality of the circumstances,

> a court must look to the characteristics of the accused and the details of the interrogation, including: (1) whether *Miranda* warnings were given; (2) the youth of the accused; (3) the accused's level of education or low intelligence; (4) the length of the detention; (5) the repeated and prolonged nature of the questioning; and (6) deprivation of food or sleep.

*State v. Cordova*, 137 Idaho 635, 638, 51 P.3d 449, 452 (2002) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (Ct. App. 1993). "A *Miranda* violation is *a factor* that is to be considered . . . in determining whether a statement was involuntary and hence a due process violation." *Woodward v. State*, 142 Idaho 98, 123 P.3d 1254 (Ct. App. 2005) (emphasis added). Additionally, "coercive police activity is a necessary

15

predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157 (1986).

The State claims that "the original suppression order was erroneous because official coercion, a condition precedent for coercion, was not identified by the district court" and that the district court's *Miranda* analysis was improperly substituted for the required due process analysis. However, the district court did make a finding of coercion. The district court, in its decision and order granting Moore's motion to suppress, stated: "Considering the totality of these circumstances, this [c]ourt finds that Moore's will was overborne by the badgering and overreaching of police such that his waiver of his *Miranda* right to counsel was not made knowingly, voluntarily, and intelligently." The district court continued, "The [c]ourt further finds that Moore's subsequent confession was not voluntary, but rather, was the product of police coercion." Based on these conclusions, the district court suppressed Moore's confession in its entirety. In its decision and order denying the State's Motion for Reconsideration, the district court clarified that it had examined all six of the *Cordova* factors. Therefore, the issue is not whether the district court used the wrong analysis, but whether it reached the wrong conclusion when it applied that analysis.

The State concedes that the police conduct in this case was "condemnable for the *Miranda* violation" but argues that the facts do not support a finding of coercion. In *State v. Andersen*, 164 Idaho 309, 429 P.3d 850 (2018), this Court held that Anderson's statements were voluntary because

> Andersen is an adult and exhibited at least normal intelligence during the interview. The questioning lasted approximately an hour. She was not deprived of food or sleep. Indeed, the only aspect of the interrogation that presents any concern as to whether her statements were voluntary, apart from the failure to give *Miranda* warnings, was when Sergeant Schneider loudly accused her of lying. However, during this most heated point of the interaction, Andersen shouted back at the officers, clearly demonstrating that her will was in no way overborne by the officers.

*Id.* at 314, 429 P.3d at 855. In *State v. Samuel*, this Court concluded that Samuel, a fourteen-year-old boy, had made his statements voluntarily. 165 Idaho at 768, 452 P.3d at 790. We relied on several facts, including that Samuel received *Miranda* warnings, he was at least of average intelligence, the interrogation was five hours, he was allowed to use the restroom, he was provided water and pizza, and "while Detective Wilhelm and Sergeant McCormick repeated some of the same questions this appears to have been done in an effort to obtain honest answers and clarify the

sequence of events." *Id.* at 767, 452 P.3d at 789. In *Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010), the United States Supreme Court held that Thompkins's statement was not coerced, noting that "[t]he interrogation was conducted in a standard-sized room in the middle of the afternoon. It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive." "Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats." *Id.* at 387.

Here, the district court made findings regarding each of the six *Cordova* factors: (1) Moore was given his *Miranda* warnings, although multiple invocations of the right to counsel were not respected; (2) Moore was 63 in 2020; (3) Moore is an educated and intelligent man evidenced by the fact he has maintained a successful chiropractic practice; (4) Moore was detained for one hour and 41 minutes before making the inculpatory statements; (5) Ryan's questioning was prolonged; and (6) although not given food, Moore was provided water, as well as a blanket and the opportunity to use the restroom upon request. The district court determined that "[t]he most critical factors in this case in determining . . . whether his confession was voluntary, are the length of his detention and the repeated and prolonged nature of his questioning by Assistant Police Chief Ryan." Moore confessed one hour and forty-one minutes into the interrogation. The interrogation began at 2:49 p.m. and, in total, lasted approximately three hours. Under *Berghuis*, the length of Moore's interrogation alone is insufficient evidence of coercion. Therefore, we must largely determine whether Ryan's questioning and disregard for Moore's invocation of the right to counsel are sufficient to determine that there was police coercion and that Moore's statements were involuntary because his will was overborne.

Absent a finding of coercion and involuntariness, statements made after disregarding a defendant's invocation of the right to counsel may still be used for impeachment purposes. Of course, once a defendant requests counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477 (1981) (quoting *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)). However, the remedy for such violation is exclusion of the statements from the prosecution's case-in-chief. The Court in *Harris* determined that "[t]he impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that

impermissible police conduct will be encouraged thereby." *Harris*, 401 U.S. at 225. However, the case before us presents the need for additional analysis, inasmuch as Moore *repeatedly* invoked the right to counsel and his request was *repeatedly* ignored.

Coercion may exist where questioning "present[s] an aspect of relentless, constantly repeated probing designed to break concentrated resistance." *Culombe v. Connecticut*, 367 U.S. 568, 623 (1961). Here, the district court, citing *Smith v. Illinois*, 469 U.S. 91, 98 (1984), found that the record showed "a pattern of badgering and overreaching by Assistant Police Chief Martin Ryan in order to 'wear down the accused [Moore] and persuade him to incriminate himself notwithstanding his earlier request[s] for counsel's assistance.' " However, we cannot agree with the district court's conclusion that Ryan overbore Moore's will. Significant to our analysis is that after Moore successfully terminated the interview, he asked to speak to Ryan "one more time." He did this without any further influence or pressure from Ryan or the other investigators

We agree with the district court's conclusion that Moore's request to speak with Ryan again is not sufficient to overcome the *Miranda* violation—he clearly asked to speak to an attorney at least three times and was essentially ignored each time. Even the State does not contest this aspect of the district court's ruling. However, we disagree with the district court's conclusion that the *Miranda* violation was sufficient to show that Moore's confession was involuntary because he was coerced. Ryan only returned to the interrogation room because Moore invited him back to talk, and Moore's confession occurred only after Ryan returned. This is not indicative of a person being coerced to confess against his will. Had Moore's will been so overborne by Ryan, he would have made the confession while Ryan was still in control, rather than waiting to confess until *after* he finally succeeded in terminating the interrogation.

Additionally, throughout the interrogation Moore doggedly stuck to some of the most implausible and embarrassing parts of his story. For example, Moore continued to maintain that he had coincidentally driven to the location of the shooting at the time of the murder so that he could relieve himself in an alleyway. Although this part of his story was mocked, ridiculed, and discounted by Ryan on multiple occasions, Moore would not deny it. In fact, even after he confessed to the murder, Moore returned to this part of his story and reemphasized to Ryan that he was telling the truth about it: "Well you may not believe it, but I did have to take a crap in the alley." This does not sound like a man who was so emotionally beaten down by a coercive interrogation that his will was overborne. Rather, it shows that Moore was still capable of standing

up for himself when confronted over facts that he knew Ryan clearly doubted and would not change his story just to please Ryan.

Again, applying the six *Cordova* factors, the undisputed facts show that Moore was 63 years old, highly educated, a successful chiropractor, and a small business owner. This background suggests that he was intelligent and generally experienced in life. His interrogation lasted only one hour and 43 minutes before he confessed. This is not an unreasonably long time. He was given water, a blanket, and access to a restroom whenever he requested. Moore was advised of his *Miranda* rights. Even though his right to an attorney was improperly denied multiple times, we still cannot conclude he was coerced into making his confession because Moore himself extended the length of interrogation by asking to speak to Ryan again. The totality of these facts combined provide substantial and competent evidence that none of the *Cordova* factors were satisfied. *Cordova*, 137 Idaho at 638, 51 P.3d at 452. Therefore, we conclude that the State met its burden to show that the confession was voluntary and uncoerced by a preponderance of the evidence. Accordingly, the district court's ruling that the confession was involuntary and, thus, inadmissible for all purposes was clearly erroneous. *Nunez*, 138 Idaho at 639, 67 P.3d at 834. We reverse the district court's decision prohibiting the use of the confession for impeachment purposes. This means that although the State may not use Moore's confession in its case-in-chief, it is admissible for impeachment purposes if Moore is prosecuted and elects to testify.

### B. The district court did not err in dismissing the case pursuant to Idaho Code section 19-815A.

After the district court determined that Moore's confession was inadmissible for all purposes, he moved to dismiss the case pursuant to Idaho Code section 19-815A. The district court granted the motion, holding that "there is no admissible evidence in the record to establish that Moore committed the crime for which he stands charged." This decision was based on the district court's finding that "the only evidence the State presented at the October 2, 2020, preliminary hearing connecting Moore to Brian Drake's death was the videotaped police interview."

The State argued that the district court erred by "review[ing] the *sufficiency* of the evidence only after retroactively determining its *admissibility*," arguing that Idaho Code section 19-815A "does not grant the power or discretion to review the preliminary hearing generally for error." (Emphasis in original). The State seeks to separate *sufficiency* from *admissibility*, suggesting that while the district court may review the *sufficiency* of the evidence considered at the preliminary hearing, that review requires consideration of all evidence without reviewing the *admissibility* of

that evidence. In other words, the State would have the district court consider only whether the confession was sufficient to prove probable cause—that the court should not consider whether the confession was admissible. Because such an approach would violate Idaho Code section 19-815A and render long-standing rules of admissibility largely meaningless in a preliminary hearing, thereby opening the door to even blatantly inadmissible evidence, we decline to accept the State's interpretation.

In support of this argument, the State cites *McDaniel v. Brown*, which states, " '[a] reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously." 558 U.S. 120, 131 (2010) (internal citations omitted) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41–42). However, *McDaniel* is distinguishable from the case at hand because it deals with two distinct steps in the adjudication process. *McDaniel* addresses a trial court's review of the sufficiency of the evidence after a defendant has been found guilty *at trial*, while this case concerns a district court's review of whether the evidence *at a preliminary hearing* is sufficient for a finding of probable cause. The standard in *McDaniel* and relied on by the State here applies to a review of the sufficiency of the evidence after a defendant has been found guilty (a *Jackson* claim): "a reviewing court must consider all of the evidence admitted at trial when considering a *Jackson* claim." *McDaniel*, 558 U.S. at 131; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.") (Emphasis in original). In a *Jackson* claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. This is not the same review Moore asked the district court to conduct.

Additionally, the State argues that unless *admissibility* is separated from *sufficiency*, "review of preliminary hearings would be a *de facto* intermediate appeal of the preliminary hearing." The State suggests this would "invite dismissal after every successful motion to suppress evidence if the evidence suppressed were used at the preliminary hearing or grand jury." However, the legislature has already allowed for such a review by specifically permitting a defendant to file a motion to dismiss challenging the "sufficiency of evidence educed at the preliminary examination." I.C. § 19-815A. The language of section 19-815A strongly suggests that *sufficiency*

20

and *admissibility*, although different concepts, cannot be completely separated from each other in review of the preliminary hearing:

> A defendant once held to answer to a criminal charge under this chapter may challenge the sufficiency of evidence educed at the preliminary examination by a motion to dismiss the commitment, signed by the magistrate, or the information filed by the prosecuting attorney. Such motion to dismiss shall be heard by a district judge.
> *If the district judge finds that the magistrate has held the defendant to answer without reasonable or probable cause* to believe that the defendant has committed the crime for which he was held to answer, or finds that no public offense has been committed, *he shall dismiss the complaint*, commitment or information and order the defendant discharged.

(Emphasis added). If the district court finds no probable cause existed without the suppressed evidence being admitted, the district court "shall dismiss the complaint." This is mandatory language. Thus, under these facts, the district court did not have the discretion to reach any other result. To conclude otherwise, would be to condone the use of blatantly inadmissible evidence just because it tended to show probable cause.

It is undisputed that the State only submitted the confession as evidence to support a finding of probable cause. However, Idaho Criminal Rule 5.1(b)(4) prohibits consideration of evidence which will ultimately be suppressed from consideration in a probable cause determination:

> Motions to suppress must be made in a trial court as provided in Rule 12. However, *if at the preliminary hearing the evidence shows facts which would ultimately require the suppression of evidence* sought to be used against the defendant, the evidence *must be excluded* and *must not be considered* by the magistrate in determining probable cause.

(Emphasis added). Therefore, if the confession should have been excluded, it could not be relied upon by the magistrate court in determining probable cause. Likewise, the district court must exclude the confession from its consideration in determining whether the magistrate court properly found probable cause. Having put forth a confession which would only be admissible for impeachment purposes, the State failed to produce sufficient evidence at the preliminary hearing to support a finding of probable cause. Accordingly, we affirm the district court's decision and order granting Moore's motion to dismiss.

Although we recognize that a remand for a new preliminary hearing may be a more practical outcome, section 19-815A only allows for dismissal. This result became inevitable because of two mistakes made before the case ever made it to district court. First, the magistrate court erred in its handling of the suppression motion and in making its *Miranda* ruling, although

21

we acknowledge that a lack of clarity in the drafting of Idaho Criminal Rule 5.1 likely contributed to this error. As recognized by the magistrate court, Moore's motion to suppress the confession should not have been raised at the preliminary hearing. Rule 5.1(b)(4) makes it clear that "[m]otions to suppress must be made in a trial court." However, under the same rule, Moore had grounds to object to the admission and consideration of his confession in the preliminary hearing. Therefore, under Rule 5.1(b)(4) the magistrate court should not have relied on a constitutionally defective confession in reaching its probable cause determination.

Second, the State made a significant tactical error in deciding to rest its case at the preliminary hearing entirely on evidence of the confession—a confession which the State now acknowledges was a violation of Moore's Fifth Amendment rights. Although the State informed the magistrate court that it had additional evidence to present should the magistrate court decide to suppress the confession, the State placed all its eggs in a legally uncertain basket. Despite the magistrate court's prudent warning that its ruling on the motion to suppress was "advisory at best," the State opted to rely on the denial of the motion to suppress the confession and elected not to present other evidence, such as the security footage that placed Moore's pickup truck at the scene of the crime. While tactical decisions can be unfairly scrutinized in hindsight, this was an unduly risky choice with significant consequences.

Importantly, we note that nothing in this opinion prevents the State from refiling its complaint against Moore. *See State v. Ruiz*, 106 Idaho 336, 338, 678 P.2d 1109, 1111 (1984) (The State would not be "barred under double jeopardy principles from refiling since an accused is not put in jeopardy at a preliminary hearing."). While refiling is admittedly not as practical an outcome as a remand for a new preliminary hearing, the plain language of section 19-1805A—"the [district judge] shall dismiss the complaint"—precludes the more expedient remedy. If the State decides to refile criminal charges against Moore, this Court's ruling on the status of Moore's confession still stands—the confession, although inadmissible at the preliminary hearing or in the State's case-in-chief at trial, would be admissible if offered for impeachment should Moore elect to testify in his own defense.

## IV. CONCLUSION

The district court's decision and order granting the motion to suppress Moore's interrogation and confession is affirmed in part and reversed in part. We affirm the ruling that the confession is inadmissible in the State's case-in-chief but reverse the ruling that the confession

22

would also be inadmissible for impeachment purposes, should Moore testify at a future preliminary hearing or at trial. We affirm the district court's decision granting the motion to dismiss pursuant to Idaho Code section 19-815A. The rulings in this opinion as to the limited admissibility of Moore's confession shall govern any future prosecution of Moore related to the murder of Drake.

Chief Justice BEVAN, Justices BRODY, STEGNER and Justice Pro Tem SCHROEDER **CONCUR.**